IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Susan Majors | : |
| | : Case No. C-1-02-64 |
| Plaintiff | : |
| | : District Judge Susan J. Dlott |
| v. | : |
| | : ORDER |
| State Farm Fire & Casualty Co. | : |
| | : |
| Defendant | : |

This matter comes before the Court on Plaintiff Susan Majors['s] Motion for Partial Summary Judgment on the Issue of Breach of Contract (doc. #30) and the Motion for Summary Judgment of State Farm Fire & Casualty Company (doc. #33). For the reasons set forth below, the Court **DENIES** Plaintiff's motion for partial summary judgment and **GRANTS** Defendant's motion for summary judgment.

## I. FACTUAL BACKGROUND

### A. The Mold

In 1987, Plaintiff Susan Majors moved into a three-bedroom split-level house on Pringle Drive in Cincinnati, Ohio. At that time, the home had inadequate insulation in its exterior walls and older windows that permitted significant drafts. It also came equipped with a humidifier attached to its furnace, which Plaintiff used during the winter. In December 1996, Plaintiff gave birth to a daughter Meredith, who was born more than three months prematurely. In April 1997, Plaintiff installed new insulated windows in order to protect Meredith from drafts.

In early January 2001 Plaintiff discovered a spot of mold on one of the bedroom walls of the house. She cleaned that spot with a commercially available mold and mildew remover. Shortly thereafter, Plaintiff spotted mold on the walls of other rooms, including the kitchen, the living room, and another bedroom, as well as on a living room window. Soon after Plaintiff found the mold, both she and her daughter began to experience various health problems, including low-grade fevers and other cold and flu-like symptoms. Within two weeks of first finding the mold, Plaintiff moved out of the house with her daughter and dog and moved in with her parents, who lived nearby. Around that time, Plaintiff began contacting environmental firms asking for cost estimates for cleaning and disposing of items in her house that might be infected with mold. Plaintiff eventually hired Pro Master Environmental Specialists ("Pro Master") to dispose of all soft items in her house, such as clothing, and to clean any harder items, such as those made of plastic, and then move them to Plaintiff's parents' house. Pro Master completed its work in April 2001. Plaintiff's father paid Pro Master more than $17,000 for its services.

In July or August 2001 Plaintiff decided to sell her home. She eventually sold it for a net purchase price of $60,000. Plaintiff claims that absent the mold contamination, her house would have been worth $100,000.

    **B.**    **The Insurance**

At the time Plaintiff discovered the mold, she was the named insured under a homeowners policy, policy number 35-98-4334-7 (the "Policy"), issued by Defendant State Farm Fire and Casualty Company ("State Farm"). (See doc. #33 exh. 1.) The Policy contains three broad areas of coverage relevant to the instant lawsuit: (1) Coverage A, which covers damage to Plaintiff's dwelling; (2) Coverage B, which covers damage to Plaintiff's personal property; and (3) Coverage

M, which covers medical expenses incurred in connection to Plaintiff's dwelling. (Id. at 3.) Coverage A is comprehensive and insures against any "accidental direct physical loss" except where coverage is specifically excluded. (Id. at 7.) In contrast, Coverage B insures against "accidental direct physical loss" only if it is caused by certain specified "perils." (Id.)

Among the exclusions to Coverage A is one that excludes from coverage loss "which consists of, or is directly and immediately caused by . . . mold, fungus or wet or dry rot." (Id. at 9.) Among the specified perils under Coverage B is "[s]udden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance." (Id. at 8.) However, this peril does not include "continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, mold, or wet or dry rot." (Id.) Finally, Coverage M excludes medical expenses arising from "bodily injury to you or any insured." (Id. at 17.) The Policy defines "bodily injury" to include "sickness[] or disease to a person" and "insured" to mean "the named insured" and relatives who are residents of the named insured's household. (Id. at 1.)

### C. The Adjustment

Plaintiff first reported the mold problem to State Farm on January 4, 2001. She spoke with her agent, Gary Schork, who told her that damage resulting from mold was not covered but that he would send a claims adjuster to her house anyway. On January 22, two State Farm claims adjusters, Devin Prinz and Gene Snow, inspected the house and again informed Plaintiff that damage due to mold was not covered. However, they told Plaintiff that they would try to obtain as much coverage as possible for her and noted areas of water damage in the house that Plaintiff had not previously

seen. Based on the claims adjusters' observations, State Farm issued Plaintiff a check for $658.19 to repair the water damage.

Eventually, State Farm hired an engineer, Leonard Rudick, P.E., to inspect the house and determine the source of the water that had caused the mold contamination in the house. Mr. Rudick issued a report on July 7, 2001, in which he concluded that excessive humidity and condensation "ultimately resulted in the apparent mold / mildew proliferation." (Doc. #33 exh. 18 at 53.) His report explained that during December 2000, extremely cold weather cooled the exterior walls of Plaintiff's home to the point that when the warmer, humid air within came into contact with them, condensation formed and that condensation allowed the mold to grow. Mr. Rudick attributed the high humidity and condensation to five possible causes: (1) lack of adequate insulation in the exterior walls of the home; (2) relatively tight construction, including the new insulated windows, preventing the introduction of drier air from outside the house; (3) inadequate ventilation of humid air from the bathrooms and kitchen; (4) perspiration and respiration of the inhabitants of the house and moisture-generating appliances, such as the dishwasher and clothes dryer; and (5) infiltration of water through the brick masonry. (Id. at 53-54.) Mr. Rudick also noted in his report that a clogged gutter and ice damming on the roof could have caused water to infiltrate through the walls in some spots and may have exacerbated the mold proliferation in parts of the house. Finally, Mr. Rudick testified in his deposition that the humidifier attached to the furnace also played a role in causing the high humidity. State Farm sent an additional $16,639.95 to Plaintiff to cover the costs of remediating the mold that Mr. Rudick identified as potentially caused by the clogged gutter or ice damming.

Plaintiff also hired an expert, Steven Bostwick, an architect, to determine the cause of the mold contamination. Mr. Bostwick reached essentially the same conclusions as those reached by Mr. Rudick. (See doc. #33 exh. 15 (Mr. Bostwick's report).)

Plaintiff filed suit against State Farm on January 2, 2002 in the Hamilton County Court of Common Pleas, alleging breach of contract and bad faith denial of her claims. She contends that Defendant failed to provide complete coverage under the Policy for the loss she suffered to her home and her personal property and for medical expenses she incurred as a result of the mold contamination. State Farm removed the case to this court on January 30, 2002.

## II.   STANDARD ON SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that permissibly can be drawn therefrom, must be read in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." Calderone v. United States, 799 F.2d 254, 259 (6th Cir. 1986) (emphasis and citation omitted). For

those issues on which the moving party will not have the burden of proof at trial, the movant must "point[] out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings, but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Although "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome a summary judgment motion, Anderson, 477 U.S. at 252, a court should not grant summary judgment merely because the nonmovant's case appears weak. The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

## III.   ANALYSIS

Defendant moves for summary judgment on Plaintiff's claims in their entirety. Plaintiff moves for partial summary judgment only on the issue of Defendant's liability for breach of contract. Both parties' motions address the same issues and thus will be addressed simultaneously.

### A.   Breach of Contract

As an initial matter, Ohio law sets forth a handful of general principles that inform the construction of insurance contracts. First, "[a] policy of insurance is a contract and like any other contract is to be given a reasonable construction in conformity with the intention of the parties as

gathered from the ordinary and commonly understood meaning of the language employed." <u>Dealers Dairy Prods. Co. v. Royal Ins. Co.</u>, 164 N.E.2d 745, 745 (Ohio 1960) (syllabus ¶1).  However, "[a] contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language used is doubtful, uncertain or ambiguous."  <u>Toms v. Hartford Fire Ins. Co.</u>, 63 N.E.2d 909, 909 (Ohio 1945) (syllabus).  Furthermore, "[w]here exceptions, qualifications or exemptions are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof." <u>Home Indem. Co. of New York v. Plymouth</u>, 64 N.E.2d 248, 248 (Ohio 1945) (syllabus ¶2).

Here, Plaintiff claims that Defendant breached the Policy by failing to provide sufficient coverage under (1) Coverage A, for the reduction in value of her house due to the mold contamination, (2) Coverage B, for refusing to pay for the costs resulting from the cleaning and destruction of her personal property, and (3) Coverage M, for refusing to cover the medical expenses that she incurred as a result of the mold.  Defendant sets forth a bevy of arguments why Plaintiff's claims should be dismissed.  The Court will address only those that it must in order to dispose of the instant motions.

    **1.**    **Coverage A**

Defendant contends that the loss to Plaintiff's dwelling is specifically excluded by the Policy's mold exclusion to Coverage A, which excludes "any loss to [Plaintiff's dwelling] which consists of, or is directly and immediately caused by, . . . mold, fungus or wet or dry rot."  The reduction in the value of her home as a result of mold contamination clearly falls within this exclusion.  Undeterred, Plaintiff argues that the loss caused by the mold is covered if the mold itself

arose out of one of the specified perils that gives rise to coverage under Coverage B. In support, Plaintiff points out that Mr. Prinz, one of Defendant's adjusters, testified in deposition that it was his understanding that if mold arises out of an enumerated specified peril then the Policy requires Defendant to pay for remediation of that mold.

Plaintiff's argument fails for two reasons. First, interpretation of unambiguous contract terms is a judicial function, and, consequently, "the opinions of percipient or expert witnesses regarding the meaning(s) of contractual provisions are irrelevant and hence inadmissible." Sheet Metal Workers, Int'l Ass'n, Local Union No. 24 v. Architectural Metal Works, Inc., 259 F.3d 418, 424 n.4 (6th Cir. 2001). The structure of the Policy is unambiguous: Coverage A covers loss to Plaintiff's home except where such coverage is excluded, while Coverage B covers loss to Plaintiff's personal property only if it is caused by certain specified perils. Plaintiff's suggested interpretation, which Mr. Prinz unwittingly adopted in deposition, imports coverage for specified perils from Coverage B into Coverage A. The Policy does not so provide.

Second, even if the Policy required coverage under Coverage A for the perils specified in Coverage B, Plaintiff's argument fails because the condensation that resulted in the mold is not a specified peril under Coverage B. Plaintiff contends that the condensation constitutes a "[s]udden and accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or from within a household appliance," which is covered under Coverage B. Specifically, Plaintiff argues that the humidifier pumped water into the air through the furnace, that the heated humid air that left the various heating ducts and vents constituted part of the "heating . . . system," and that when the water condensed out of the air onto the cool exterior walls, that condensation was a "sudden" and "accidental" discharge of water

from the "heating . . . system." However, Plaintiff's interpretation contradicts the unambiguous meaning of the term "sudden" as it is used in the Policy.[1]

Plaintiff argues that condensation is a "sudden" discharge because it happens instantaneously once the walls reach the dew point of the hotter, humid interior air: in one instant, the water is a vapor intermixed with the surrounding air, and in the next, it is a droplet of water on the wall. However, the interpretation of a contract is not a metaphysical inquiry; it is a practical one that requires the Court to read the Policy's language in context and to give the words used their ordinary meaning. See Carroll Weir Funeral Home v. Miller, 207 N.E.2d 747, 749 (Ohio 1965). Black's Law Dictionary defines "sudden" to mean "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." Black's Law Dictionary 1432 (6th ed. 1990). This definition, while helpful, is not entirely unambiguous. Fortunately, the Policy provides a context that aids in clarifying the ambiguity. Specifically, it contrasts loss caused by the "sudden and accidental discharge . . . of water," which is covered under Coverage B, with loss resulting from "continuous or repeated seepage or leakage of water or steam which occurs over a period of time and results in deterioration, corrosion, rust, mold, or wet or dry rot," which is not. Examining the dictionary definition of "sudden" together with the context of its use in the Policy, the Court finds that the term's use in the Policy is unambiguous: it describes a discharge of water that is not continuous or repeated, but rather occurs instantaneously, unexpectedly, and without previous notice.

---

[1] Because the disposition of the parties' motions does not so require, the Court expresses no opinion on whether Plaintiff accurately construes the terms "heating . . . system" or "accidental."

Mr. Bostwick testified in his deposition that the mold contamination resulted from "the continuous or repeated nature of th[e] condensation" on the walls of Plaintiff's home. (See deposition of Steven J. Bostwick at 59-60.) Plaintiff points to no evidence that contradicts Mr. Bostwick's expert opinion.[2] Thus, the damage that Plaintiff suffered was not the result of a "sudden" discharge of water, as that term is used in the Policy. Consequently, the condensation is not a specified peril under Coverage B and, even under Plaintiff's theory, could not provide an independent basis for coverage under Coverage A.

**2.     Coverage B**

---

[2] Plaintiff attaches to her memorandum in opposition to Defendant's motion an affidavit of Doug Koliboski, one of her expert witnesses. (See attachment to doc. #36 ("Koliboski aff.").) At Plaintiff's request, Mr. Koliboski provided an opinion "as to whether the conduct of State Farm and its agent met the usual and customary standard of practice in this area for adjusting an insurance claim." (Doc. #39 exh. B (Koliboski expert report).) In rendering his opinion, Mr. Koliboski reviewed the correspondence between Plaintiff, her counsel, and Defendant, the complaint, the answer, two expert reports, and the claim file created by Defendant. Defendant moves to strike Mr. Koliboski's affidavit on the ground that it violates Federal Rules of Civil Procedure 26(a)(2), 56(e), and 56(g). (Doc. #39.) While the majority of the affidavit addresses issues irrelevant to the Court's analysis, it contains two statements of potential relevance. First, Mr. Koliboski opines that the formation of condensation on the walls of Plaintiff's home was "sudden," as that term is used in the Policy. As noted above, where contract terms are unambiguous, expert testimony on the construction of those terms is irrelevant and inadmissible. Sheet Metal Workers, 259 F.3d at 424 n.4. The Court has found that, in the context of the Policy, the term "sudden" is unambiguous. Mr. Koliboski's opinion on the matter is therefore irrelevant. Second, Mr. Koliboski states, "There is no evidence that the condensation occurred over and over again." (Koliboski aff. ¶3.) This is nothing more than a conclusory statement of fact that does not comport with Rule 56(e), which requires that "opposing affidavits . . . be made on personal knowledge." Fed. R. Civ. P. 56(e). See 10B Charles Alan Wright et al., Federal Practice and Procedure § 2738 (3d ed. 1998) ("ultimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary-judgment motion"). Moreover, Mr. Koliboski's assertion contradicts the record, as Mr. Bostwick, an expert who actually examined Plaintiff's home, testified that the mold could not have grown absent repeated condensation. Thus, the Court also ignores this portion of Mr. Koliboski's affidavit. Because the affidavit provides no additional relevant evidence, the Court **DENIES AS MOOT** Defendant's motion to strike.

Given the above analysis, the Court may easily dispose of Plaintiff's claim for coverage of the loss to her personal property. Plaintiff contends that she is entitled to coverage under Coverage B because she suffered loss due to a "sudden and accidental discharge . . . of water." As the Court just explained, the condensation that alleged led to the loss to Plaintiff's personal property is not a specified peril under Coverage B. Plaintiff identifies no other source for coverage under Coverage B. Thus, Plaintiff's claim for such coverage must fail.

        **3.**      **Coverage M**

Finally, Coverage M specifically excludes medical expenses incurred due to bodily injury "to you or any insured." The Policy defines "you" to mean the named insured and "insured" to mean "you and, if residents in your household . . . your relatives." Plaintiff is the named insured under the Policy. Thus, Coverage M covers neither Plaintiff nor her daughter, a relative with whom she shares a household. Thus, Plaintiff's claims for reimbursement of her medical expenses must fail.

        **B.**      **Bad Faith Denial of Claims**

Plaintiff also brings a claim alleging that Defendant denied her claims in bad faith. "Ohio recognizes a cause of action in tort against insurance companies for wrongful failure to pay the claim of an insured." Asmaro v. Jefferson Ins. Co. of New York, 574 N.E.2d 1118, 1123 (Ohio Ct. App. 1989). The Court has found that Plaintiff is not entitled to coverage under the Policy. Thus, Defendant's decision to deny her coverage cannot be deemed "wrongful," and Plaintiff's claim for bad faith denial of coverage fails. See Hoskins v. Aetna Life Ins. Co., 452 N.E.2d 1315, 1320 (Ohio 1983) (insurer not liable for bad faith where conduct is "based on circumstances that furnish reasonable justification therefor").

### IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Motion for Summary Judgment of State Farm Fire & Casualty Company (doc. #33) and **DENIES** Plaintiff Susan Majors[']s] Motion for Partial Summary Judgment on the Issue of Breach of Contract (doc. #30).

IT IS SO ORDERED.


                              ____s/Susan J. Dlott_____
                              Susan J. Dlott
                              United States District Judge