Robert F. Croskery & Associates Co., L.P.A.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| SUSAN MAJORS, et al. | : | Case No. C-1-02-064 |
| Plaintiff, | : | Judge Susan J. Dlott |
| vs. | : | **PLAINTIFF SUSAN MAJORS MOTION TO AMEND COURT'S** |
| STATE FARM FIRE & CASUALTY COMPANY, | : | **JUDGMENT DENYING HER PARTIAL MOTION FOR SUMMARY** |
| | : | **JUDGMENT AND GRANTING** |
| Defendant. | | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT TO REVERSE OUTCOME UNDER RULE 59 F. RULE CIV. PRO.** |

Now comes Plaintiff, by and through Counsel, and hereby submits her Motion to Amend Judgment under Rule 59 seeking that this Court reverse its denial of her Motion for Partial Summary Judgment and its granting of the Defendant's Motion for Summary Judgment,[1] then restore the case to its active docket for trial of the remaining issues.

Respectfully Submitted,

*/s/ Croskery*

OF COUNSEL:

Croskery Law Offices
6860 Tylersville Road   Suite 1
Mason, Ohio 45040
Telephone: (513) 701-5529
Fax:        (513) 701-5528
Rcroskery@Croskerylaw.com

Robert F. Croskery (0064802)
Melinda E. Knisley (0020662)
Trial Attorneys for Plaintiff
6860 Tylersville Road Suite 1
Mason, Ohio 45040
Telephone:   (513) 701-5529
Fax:         (513) 701-5528
Rcroskery@Croskerylaw.com

---

[1] Plaintiff realizes that this Motion to Amend is in essence a Motion for Reconsideration that seeks, for the sake of judicial economy, an early correction of what she believes to be an erroneous ruling.

I. STATEMENT OF THE CASE

A. Procedural posture.

The Court granted a Motion for Summary Judgment to State Farm Insurance on August 29, 2003 and denied Plaintiff's partial Motion for Summary Judgment via the same order. The basis for the denial, in essence, was the Court's decision that the condensation leading to the mold was not a "sudden" event *based on the testimony of an architect* (thus taking it outside named perils coverage for water damage), and that mold was specifically excluded and that State Farm's adjuster's position that it would be covered if caused by a covered peril was simply wrong. Because both of these conclusions appear to be erroneous under the Ohio law that governs this case, Plaintiff respectfully asks this Court to reconsider its decision and amend the judgment accordingly.

B. RELEVANT FACTS FOR RECONSIDERATION

Rather than rehashing all the facts of the case, Plaintiff will focus on those relevant to reconsideration. The first is to correct a misapprehension of the Court concerning the testimony of Mr. Devon Prinz. At its Order dated August 29, 2003 on page 8, the Court states that Mr. Prinz understood that "if mold arises out of an enumerated specified peril than the Policy requires Defendant to pay for remediation of that Mold." Actually, his testimony is that if the mold "arises out of a *covered event*" [emphasis supplied] that the Company pays for remediation. Depo. Devon Prinz p. 48 line 19 through Page 49 line 4.[2]

---

[2] Mr. Prinz also did not "unwittingly adopt" the language in a trick question, as the Court appears to believe. The full relevant testimony reads: Q: What do you recollect . . . ? A: ...How we interpret the insuring contract . . . Q: Tell me about that. A: " . . . if we have a covered event under the insurance contract and there is physical damage and mold arises out of that covered event . . . we would have coverage".

The second important fact is that Steven Bostwick, expert for the Plaintiff was NOT called as a physicist, nor does he have any particular expertise on defining whether or not an event meets the insurance definition of "sudden" in a statement that condensation was "continuous", nor does he have expertise in the nature of condensation, and such an opinion as is relied upon by the Court does not appear in his expert report. In contrast, Defendant's expert agrees in deposition, condensation occurs at a "discrete point–the dew point". The Court also ignores Doug Kolibosky's statement that "there is no evidence of recurring condensation" as conclusory. On the contrary, he, at least, is an expert witness who is intimately familiar with claims file review, and he is making a summary of a voluminous record that appears in the claims file, something that he is well-qualified to do. If any statement is conclusory, it would be the statement that there was "repeated condensation", which contradicts the testimony of Susam Majors that the condensation (and mold) appeared only once, and very rapidly at that, in a brief period in early January. Having addressed these two facts, it is time to turn to argument.

## II. ARGUMENT

### A. THE MOLD THAT DAMAGED SUE MAJOR'S HOUSE IS COVERED UNDER PART A BECAUSE IT IS A RESULT OF A COVERED CONDITION, CONDENSATION, AND IS NOT ONE OF THE "SPECIAL PERILS" THAT EXPRESSLY EXCLUDES SUCH COVERAGE

Clearly, under Part A, a "covered event" is any event not specifically excluded. Certain events are excluded in incredibly detailed and explicit terms. If such an event (Example: flood) leads to mold, there is no coverage. The language that makes this plain appears, in fact, on p. 9-10 of the policy (authenticated elsewhere and attached for convenience). The policy states that

> We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of a) the cause of the excluded event; or b) other causes of the loss or c)

whether other causes acted concurrently or in any sequence with the excluded event to produce the loss or d) whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these: . . . c) Water Damage, meaning 1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, all whether driven by wind or not . . .

The point here is that the contract of insurance clearly designates, under coverage A, those particular perils that are excluded even if there are other causes or even if they bring about another covered loss. MOLD IS NOT ONE OF THOSE SIX "SPECIAL PERILS"[3] Under the rule of *inclusio unius est exclusio atlerius*, and coupled with the strong Ohio law interpreting insurance contracts strictly in favor of the insured, if condensation is a covered event (which it is, as it is not excluded under coverage A) then resulting mold is covered *regardless* of the exclusion of mold in isolation. While mold resulting from a flood or a sewer back-up would not be covered, mold resulting from condensation clearly is, else condensation would be included in the definition of the six "special perils" to which greater restrictions apply. Mr. Prinz, Michelle, his supervisor, Mr. Kolibosky, and the Ohio Insurance Commissioner are all correct: a *covered event* that gives rise to mold provides for remediation. Thus, the only question remaining is whether property is also covered under Coverage B.

**B. SUSAN MAJOR'S PROPERTY LOSS IS COVERED UNDER PART B BECAUSE THE CONDENSATION THAT CAUSED THE MOLD WAS "SUDDEN" AND ACCIDENTAL**

In analyzing the meaning of the word sudden, this Court relied upon "Black's Law Dictionary" and "common sense" rather than making a "metaphysical inquiry". (Order p. 9). With respect, as this is a case to be decided under Ohio law, the best definition to use is

---

[3] The "special perils" are law, earth movement, water damage (e.g. from floods, sewage, or underground streams), neglect, war, and nuclear hazard.

probably that provided by the Ohio Supreme Court. In *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* 64 Ohio St.3d 6 (1992), the Court opined as follows:

> As it is most commonly used, "sudden" means happening quickly, abruptly, or without prior notice. This is the plain and ordinary meaning of the word, and the context in which it is employed does not indicate that it should be given any other meaning. Second, . . . that unless "sudden" is interpreted to have a temporal aspect, the word does not add anything to the phrase "sudden and accidental."

Thus the question for the Court is whether the condensation that led to the mold was sudden–that is, whether it happened quickly or "without prior notice". Since the discrete point when the temperature passed the dew point happened without any notice to Plaintiff, and logic dictates that the mold was not from weather, nor from an inherent "design flaw" in the house, or it would have repeatedly been occurring in the past, it was "sudden". It was a "one shot deal" that did not happen before or since, the conclusory statement of Bostwich in an area on which he has no expertise notwithstanding.

At minimum, this is a question of fact to be determined at trial; more probably, the Court may declare–as a matter of law–that the discharge of water from the heating system was "sudden" as it occurred on one known occasion when the dew point was reached in the interior walls of the house.

## CONCLUSION

The Court should amend its order of August 29, 2003, by reversing the findings, granting partial summary judgment in favor of the Plaintiff and against the Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion to Amend the Judgment has been sent via fax and regular U.S. mail to Gordon D. Arnold and John Witherspoon, Attorneys for Defendant, One Dayton Centre, 1 South Main Street, Dayton, Ohio 45402, this 8th day of September, 2003.

_____
Robert F. Croskery

15. **Sudden and** accidental **damage to electrical** appliances, devices, fixtures and wiring from an increase or decrease of artificially generated electrical current. We will pay up to $1,000 under this peril for each damaged item described above.

16. **Breakage of glass**, meaning damage to personal property caused by breakage of glass which is a part of a building on the **residence premises**. There is no coverage for loss or damage to the glass.

## SECTION I - LOSSES NOT INSURED

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more of the perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

   a. collapse, except as specifically provided in SECTION I - ADDITIONAL COVERAGES, Collapse;

   b. freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system, or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion only applies while the dwelling is vacant, unoccupied or being constructed. This exclusion does not apply if you have used reasonable care to:

      (1) maintain heat in the building; or

      (2) shut off the water supply and drain the system and appliances of water;

   c. freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a swimming pool, hot tub or spa, including their filtration and circulation systems, fence, pavement, patio, foundation, retaining wall, bulkhead, pier, wharf or dock;

   d. theft in or to a dwelling under construction, or of materials and supplies for use in the construction, until the dwelling is completed and occupied;

   e. vandalism or malicious mischief or breakage of glass and safety glazing materials if the dwelling has been vacant for more than 30 consecutive days immediately before the loss. A dwelling being constructed is not considered vacant;

   f. continuous or repeated seepage or leakage of water or steam from a:

      (1) heating, air conditioning or automatic fire protective sprinkler system;

      (2) household appliance; or

      (3) plumbing system, including from, within or around any shower stall, shower bath, tub installation, or other plumbing fixture, including their walls, ceilings or floors;

   which occurs over a period of time. If loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance. We do not cover loss to the system or appliance from which the water or steam escaped;

   g. wear, tear, marring, scratching, deterioration, inherent vice, latent defect or mechanical breakdown;

   h. corrosion, electrolysis or rust;

   i. mold, fungus or wet or dry rot;

   j. contamination;

   k. smog, smoke from agricultural smudging or industrial operations;

   l. settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundation, walls, floors, roofs or ceilings;

   m. birds, vermin, rodents, insects, or domestic animals. We do cover the breakage of glass or safety glazing material which is a part of a building, when caused by birds, vermin, rodents, insects or domestic animals; or

n. pressure from or presence of tree, shrub or plant roots.

However, we do insure for any resulting loss from items a. through m. unless the resulting loss is itself a Loss Not Insured by this Section.

2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

  a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure.

  b. Earth Movement, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in SECTION I - ADDITIONAL COVERAGES, Volcanic Action.

  However, we do insure for any direct loss by fire resulting from earth movement, provided the resulting fire loss is itself a Loss Insured.

  c. Water Damage, meaning:

    (1) flood, surface water, waves, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, all whether driven by wind or not;

    (2) water or sewage from outside the residence premises plumbing system that enters through sewers or drains, or water which enters into and overflows from within a sump pump, sump pump well or any other system designed to remove

    subsurface water which is drained from the foundation area; or

    (3) water below the surface of the ground, including water which exerts pressure on, or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure.

  However, we do insure for any direct loss by fire, explosion or theft resulting from water damage, provided the resulting loss is itself a Loss Insured.

  d. Neglect, meaning neglect of the insured to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered.

  e. War, including any undeclared war, civil war, insurrection, rebellion, revolution, warlike act by a military force or military personnel, destruction or seizure or use for a military purpose, and including any consequence of any of these. Discharge of a nuclear weapon shall be deemed a warlike act even if accidental.

  f. Nuclear Hazard, meaning any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these. Loss caused by the nuclear hazard shall not be considered loss caused by fire, explosion or smoke.

  However, we do insure for any direct loss by fire resulting from the nuclear hazard, provided the resulting fire loss is itself a Loss Insured.

3. We do not insure under any coverage for any loss consisting of one or more of the items below. Further, we do not insure for loss described in paragraphs 1. and 2. immediately above regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss:

  a. conduct, act, failure to act, or decision of any person, group, organization or governmental body whether intentional, wrongful, negligent, or without fault;

defects, inadequacy or soundness of property (including land, trees, shrubs or improvements of any kind) whether on or off the residence premises; or

in:

(1) planning, zoning, development, surveying, siting;

(2) design, specifications, workmanship, construction, grading, compaction;

(3) materials used in construction or repair; or

(4) maintenance;

c. weather conditions.

However, we do insure for any resulting loss from items a., b. and c. unless the resulting loss is itself a Loss Not Insured by this Section.

## SECTION I – LOSS SETTLEMENT

Only the Loss Settlement provisions shown in the Declarations apply. We will settle covered property losses according to the following.

### COVERAGE A – DWELLING

1. **A1 – Replacement Cost Loss Settlement – Similar Construction.**

   a. We will pay the cost to repair or replace with similar construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I – COVERAGES, COVERAGE A – DWELLING, except for wood fences, subject to the following:

      (1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;

      (2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

      (3) to receive any additional payments on a replacement cost basis, you must complete the actual repair or replacement of the damaged part of the property within two years after the date of loss, and notify us within 30 days after the work has been completed; and

      (4) we will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL – Building Ordinance or Law Coverage.

   b. **Wood Fences:** We will pay the actual cash value at the time of loss for loss or damage to wood fences, not to exceed the limit of liability shown in the Declarations for COVERAGE A – DWELLING EXTENSION.

2. **A2 – Replacement Cost Loss Settlement – Common Construction.**

   a. We will pay the cost to repair or replace with common construction and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I – COVERAGES, COVERAGE A – DWELLING, except for wood fences, subject to the following:

      (1) we will pay only for repair or replacement of the damaged part of the property with common construction techniques and materials commonly used by the building trades in standard new construction. We will not pay the cost to repair or replace obsolete, antique or custom construction with like kind and quality;

      (2) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or

FP-7955